UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**CRIMINAL ACTION NO. 03-116-C**

**UNITED STATES OF AMERICA,**                                                  **PLAINTIFF,**

**V.**                   **MEMORANDUM OPINION AND ORDER**

**EYAD SULEIMAN**                                                          **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the defendant's motion for a judgment of acquittal (DE 159) and his alternative motion for a new trial (DE 160). The court, having reviewed the record and being otherwise advised, will deny both motions.

**I.**      **The Defendant's Motion for a Judgment of Acquittal**

The defendant has moved for a judgment of acquittal after a jury verdict pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, which provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." More specifically, the defendant claims that "it is clear that there was insufficient evidence presented by the United States to sustain the Jury's verdict of guilty." (DE 159-1 at 5.) "When reviewing a claim of insufficient evidence," the court must "examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and *United*

*States v. Riffe*, 28 F.3d 565, 567 (6th Cir. 1994)).

The defendant was convicted of knowingly receiving and possessing stolen over-the-counter pharmaceuticals ("OTC") valued at $5,000 which crossed a state boundary after being stolen, in violation of 18 U.S.C. § 2315. The defendant now argues that the evidence was insufficient to support this conviction in several ways. In general, the defendant claims that only the evidence about the OTC sold by Gina Cortez to the defendant prior to her arrest can be used to support the verdict.[1]

With respect to the OTC purchased by the defendant from Gina Cortez, the defendant offers three arguments. First, he argues that "[a]lthough the United States introduced evidence that some unknown quantity of OTC was stolen and shipped by Gina Cortez across a state boundary prior to her arrest in Madison, Wisconsin," the United States "failed to prove . . . that the value of those items was $5,000.00 or more." (DE 159-2 at 1.) Second, the defendant argues that

---

[1] More specifically, the defendant argues that three questions sent by the jury to the court during the jury's deliberations demonstrate that the jury "was only considering the OTC shipments from Gina Cortez," and the defendant also points out that both the court and the United States agreed that the OTC shipped by Cortez to the defendant after her arrest could not be considered stolen. (DE 159-1 at 4-5, DE 159-2 at 2 n.1.) Furthermore, the defendant claims that "the United States was unable to prove that the non-Cortez OTC received and possessed [by the defendant] from January, 2005 to September, 2005, even if stolen, crossed a state boundary." (DE 159-2 at 2-3.)

Because the court finds that the jury could have found the elements of the offense beyond a reasonable doubt based solely on the evidence submitted by various witnesses about the stolen OTC shipped by Cortez to the defendant prior to her arrest, the court need not and will not reach these issues.

2

"[a]lthough the United States introduced evidence that Cortez sold OTC in excess of $5,000 to Suleiman on several other occasions between June and August 2005," the United States "failed to prove beyond a reasonable doubt that those items crossed a state boundary" because, although "Cortez testified she stole OTC in Kentucky" as well as other several other states, she was never asked at trial "whether the items she sold to Suleiman between June and August 2005 were stolen from stores [in Kentucky or stores] in other states." *Id.* at 1-2.  Third, the defendant argues that "the United States failed to prove that Suleiman had knowledge that the OTC received and possessed by Alpha Trading had been stolen." *Id.* at 3.  The court will address these claims in more detail below.

### A.   The Value of the Stolen OTC

Although the defendant "maintains that there was insufficient proof put on by the United States that the value of the goods" received by the defendant "from Cortez [after her arrest] was $5,000 or more[,]" the defendant concedes that the defendant paid $9,200 for the OTC stolen by Gina Cortez in Madison, Wisconsin and shipped to the defendant both before and after her arrest.[2]  Despite this concession, the defendant claims that testimony at trial "established that the OTC . . . seized from Cortez at the time of her arrest" and subsequently "used in the FBI operation of September 5, 2005 were not inventoried by the FBI nor were they

---

[2] The defendant acknowledges that he gave Cortez $9,200 in cash, after writing her a check under one of her aliases and then cashing that same check, for the OTC which she stole in Madison.  (DE 159-2 at 3.)

3

segregated from the boxes of OTC shipped to Alpha Trading by Cortez prior to her arrest." (DE 159-2 at 3.)

The government does not contest these claims. Instead, the government points out that testimony at trial revealed that at the time of her arrest Cortez was in possession of $14,000 worth of OTC, but that prior to her arrest she had already "shipped two boxes of stolen OTC from Wisconsin to Suleiman in Kentucky." (DE 163 at 2.) The government also claims that the $9,200 paid by the defendant to Cortez was for *all* of the OTC stolen and shipped from Wisconsin, not merely the OTC stolen and shipped from Wisconsin *after* Cortez's arrest.[3] Finally, the government argues that the evidence at trial revealed "Suleiman paid Cortez $.33 for every dollar worth of OTC she stole and shipped to him." *Id.* at 2-3. Accordingly, the government concludes that even though the OTC stolen and shipped from Wisconsin by Cortez prior to her arrest was not segregated from the rest of the OTC in the defendant's warehouse, the evidence presented at trial demonstrated that the value of this OTC was well in excess of $5,000.[4]

---

[3] The defendant does not contest this claim.

[4] In other words, based on the defendant's payment of $9,200 in cash to Cortez, the government calculates that the actual retail value of the stolen OTC Cortez shipped to the defendant from Wisconsin, both before and after her arrest, was at least $27,600. Therefore, even though Cortez was found with $14,000 in retail value of stolen OTC at the time of her arrest, which was eventually shipped to the defendant, the retail value of the stolen OTC she shipped to the defendant prior to her arrest must have been $13,600, well over the $5,000 minimum required by 18 U.S.C. § 2315.

The court is persuaded by the government's argument. Therefore, the court finds that a rational trier of fact could have found, beyond a reasonable doubt, that Cortez shipped over $5,000 of stolen OTC from Wisconsin to the defendant in Kentucky prior to her arrest.

**B.     Whether the Stolen OTC Crossed State Lines**

The defendant acknowledges that the evidence at trial established that Cortez sold him stolen OTC worth well over $5,000 during June and August of 2005.  (DE 159-2 at 1.)  Nevertheless, he argues that the United States failed to prove beyond a reasonable doubt that over $5,000 worth of the stolen OTC crossed a state boundary after it was stolen for at least two reasons: first, because Cortez testified that she stole OTC in Kentucky; and second, because the United States did not ask Cortez at trial "whether the items she sold to Suleiman between June and August 2005 were stolen from stores in other states." *Id.* at 2.  Based on the argument and findings discussed immediately above, however, the court finds that a rational trier of fact could have found, beyond a reasonable doubt, that Cortez shipped over $5,000 of stolen OTC from Wisconsin to the defendant in Kentucky prior to her arrest.

**C.     Whether the Defendant Knowingly Received Stolen OTC**

Finally, the defendant claims that the evidence was insufficient to support the jury's verdict because "the United States failed to prove that Suleiman had knowledge that the OTC received and possessed by Alpha Trading had been

5

stolen." (DE 159-2 at 3.) More specifically, the defendant points out that the FBI's "informant inside Alpha Trading for five months never heard Suleiman or anyone else refer to the OTC as stolen." *Id.* In addition, the defendant points out that the uncontested testimony at trial indicated "that Suleiman reacted negatively and vehemently whenever Cortez mentioned stolen goods." *Id.* The United States does not contest these claims, but instead relies on an analogous situation from *United States v. Warshawsky*, 20 F.3d 204, 209-10 (6th Cir. 1994).

As in the instant case, in the *Warshawsky* trial the United States "argued to the jury that the nature of the [goods at issue] and the prices at which these [goods] were sold clearly indicated that the parts were stolen" based on expert testimony and other proof that showed the defendants purchased the goods at issue "at an unreasonably steep discount." 20 F.3d at 209-10. On appeal, the Sixth Circuit held that this evidence was "[p]lainly . . . sufficient, viewed in the light most favorable to the prosecution, to establish [the defendants'] knowledge that they were purchasing stolen parts." *Id.* at 210. Applying *Warshawsky*'s reasoning to the analogous situation in the instant case, and recognizing that "it is the jury's function . . . to weigh the evidence and choose among competing views[,]" *see id.*, the court finds that a rational trier of fact could have found, beyond a reasonable doubt, that the defendant knowingly received and possessed over $5,000 of stolen OTC shipped by Cortez from Wisconsin to the defendant in Kentucky prior to her arrest. Accordingly, the court will deny the defendant's motion for a judgment of

acquittal.

## II. The Defendant's Motion for a New Trial

According to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In general, "[t]he defendant bears the burden of proving the need for a new trial and such motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993). The defendant has based his alternative motion for a new trial on the same grounds as his motion for a judgment of acquittal. *See, e.g.*, DE 160-2 at 5 (arguing that "[i]n the alternative, based upon the [reasons given] above, the defendant moves the court to grant him a new trial"). Because the court finds, for the reasons stated above, that the defendant has not shown that the interest of justice requires a new trial, the court will deny his motion for a new trial. Accordingly,

**IT IS ORDERED** that the defendant's motion for a judgment of acquittal (DE 159) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's alternative motion for a new trial (DE 160) is **DENIED**.

Signed on July 9, 2007

Jennifer B. Coffman, Judge
United States District Court

7